

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 1 3 2009

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

JOSE G. CUARENTA-RAMOS, J.
CARMEN PENA-MARES, JOSE
RODRIGUEZ-HERNANDEZ, and
PEDRO YANEZ-VAZQUEZ,

§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 4:09-CV-368 SWW

This case assigned to District Judge __Wright__
and to Magistrate Judge __Cavaneau__

      **Plaintiffs,**

**vs.**

**JACK ODOM D/B/A ODOM FARMS,**

      **Defendant.**

## PLAINTIFFS' ORIGINAL COMPLAINT

### PRELIMINARY STATEMENT

    1.    Four agricultural guestworkers bring this civil action for damages and declaratory relief. The Plaintiffs, citizens of Mexico, were trafficked by Defendant Jack Odom to Lonoke County, Arkansas. There, Defendant Jack Odom confiscated their passports and confined them to an infested, filthy, and dangerous metal storage shed when they were not working. The shed was freezing in the late fall and extremely hot in summer and early fall. The shed was filled with sweet potatoes, sweet potato worms, machines, and dangerous industrial fluids that made the workers sick. The Plaintiffs were forced to labor under conditions violating federal immigration and labor law and contrary to their employment contracts and were subjected to frequent verbal abuse and harassment. Despite these conditions, the Plaintiffs, dependent on the H-2A system for their livelihoods, stayed on the farm because Defendant Jack Odom threatened that they would never be able to return to the United States legally if they left.

2.      The Plaintiffs bring this action to vindicate rights afforded them by the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 et seq., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and state contract law.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over claims arising under the laws of the United States) and 28 U.S.C. § 1337 (conferring jurisdiction over claims arising under acts of Congress regulating commerce).

4.      This action is authorized by and instituted pursuant to 18 U.S.C. § 1595(a) (conferring jurisdiction over claims arising under the TVPA) and 29 U.S.C. § 216(b) (conferring jurisdiction over claims arising under the FLSA).

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiffs' state law claims because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      This Court has personal jurisdiction over Defendant Jack Odom.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiffs Jose Guadalupe Cuarenta-Ramos, J. Carmen Pena-Mares, Jose Rodriguez-Hernandez, and Pedro Yanez-Vazquez are citizens of Mexico who reside in Celaya, Guanajuato, Mexico.

10.     At all times relevant to this action, the Plaintiffs were temporary non-immigrant agricultural workers lawfully admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

11.     At all times relevant to this action, the Plaintiffs were "employees" of Defendant Jack Odom within the meaning of 29 U.S.C. § 203(e).

12.     At all times relevant to this action, the Plaintiffs were engaged in the production of goods for commerce within the meaning of 29 U.S.C. §§ 203 and 206.

13.     Defendant Jack Odom ("Defendant") is a natural person who resides in Lonoke County, Arkansas.  The Defendant owns and operates Odom Farms, an agribusiness located in Lonoke County, Arkansas and engaged in growing, packing, and selling sweet potatoes.

14.     At all times relevant to this action, the Defendant was the Plaintiffs' "employer" within the meaning of 29 U.S.C. § 203(d).

## STATEMENT OF FACTS

15.     For the 2006, 2007, and 2008 seasons, the Defendant filed H-2A visa applications with the U.S. Department of Labor, seeking workers for the Defendant's sweet potato farm in Austin, Arkansas.

16.     For the 2006 season, the Defendant obtained H-2A guestworker visas from the U.S. Department of Labor for Plaintiffs Jose Guadalupe Cuarenta-Ramos, Jose Rodriguez-Hernandez, and Pedro Yanez-Vazquez.

17.     For the 2007 season, the Defendant obtained H-2A guestworker visas from the U.S. Department of Labor for Plaintiffs Jose Guadalupe Cuarenta-Ramos, J. Carmen Pena-Mares, Jose Rodriguez-Hernandez, and Pedro Yanez-Vazquez.

18.     For the 2008 season, the Defendant obtained an H-2A guestworker visa from the U.S. Department of Labor for Plaintiff Jose Guadalupe Cuarenta-Ramos.

19.     Since at least 2005, the Defendant has used a Mexican national named Angel Rico to recruit, transport, supervise, control, and otherwise interact with H-2A guestworkers for Odom Farms.

20.     At all times relevant to this action, Angel Rico was acting as the Defendant's agent.

21.     In 2006, 2007, and 2008, the Plaintiffs planted, harvested, and/or packed sweet potatoes on the Defendant's farm.

22.     Upon the Plaintiffs' arrival at the Defendant's farm in 2006, 2007, and 2008, the Defendant confiscated the Plaintiffs' passports.

23.     Each season, the Defendant refused to return the Plaintiffs' passports until the Plaintiffs had completed their contracts with Odom Farms.

24.     In order to further control the workers' movements, Angel Rico
sometimes kept the workers' passports until after he had returned with them to Mexico.

25.     At least several of the Plaintiffs were afraid to leave the Defendant's farm
and/or leave their jobs with the Defendant without their passports because they were
reasonably fearful that, if they did, they would be detained by immigration authorities for
not carrying proper documentation.

26.     At least several of the Plaintiffs were told by the Defendant and/or
reasonably feared that he would report them to immigration authorities if they left the
farm before their contracts were finished.

27.     The Defendant told at least one of the Plaintiffs that he had to finish his
contract and could only leave the farm when the season ended.

28.     Upon the Plaintiffs' arrival at the farm, the Defendant subjected them to
rules that restricted their movement and isolated them physically from the surrounding
community.  The restrictions included, but were not limited to, the following:

    a.  The Defendant told the Plaintiffs that they could not leave the farm, even
    to walk down the road to purchase a drink or a phone card, unless Angel Rico was
    escorting them.

    b.  The Plaintiffs were not allowed to leave the metal shed where they were
    sleeping, except when they went to work in the fields or when Angel Rico escorted
    them.  If a worker ventured outside the poorly ventilated shed to get some air, the
    Defendant would yell at the worker and tell him to get back inside.

29.     The Defendant explained to the workers that he did not want anyone to
know they were living on the farm.

30.     Because of these restrictions, the Plaintiffs were worked into a state of fear
and did not feel free to leave the farm, or even to leave their metal shed, during the time
they worked for the Defendant.

31.     The Defendant often verbally abused the workers and frequently cursed
them.  As a result, the Plaintiffs were careful not to do anything to make him angry.

32.     The Defendant threatened the Plaintiffs that, if they left without finishing
their contracts, he could stamp their passports so that they would never again be able to
obtain H-2A visas or work in the United States legally.  This representation was false.

33.     The Plaintiffs speak little or no English.  While employed by the Defendant, the Plaintiffs were not able to communicate with non-Spanish-speakers near the farm without the assistance of Angel Rico.

34.     The Plaintiffs depend on the availability of H-2A program jobs each year to provide for themselves and their families.

35.     All of the Plaintiffs took out large loans in Mexico in order to pay recruitment and travel expenses for work at the Defendant's farm.  The Plaintiffs expected to use the income they would earn from their employment with the Defendant to pay those loans back.

36.     As a result of the Defendant's actions as described above, the Plaintiffs reasonably believed that they could be placed in removal proceedings and/or would lose their ability to return to the United States legally if they did not continue to work for the Defendant through the end of their contracts.

37.     The Defendant's actions compelled the Plaintiffs to continue to work for the Defendant under miserable, unlawful conditions to avoid the consequences they reasonably feared would follow if they tried to leave the farm.

38.     In order to travel to Arkansas and begin work for the Defendant in 2006, 2007, and 2008, the Plaintiffs were required to incur various expenses, including but not limited to visa fees, recruitment and hiring expenses, and transportation to Arkansas from their villages in Mexico.

39.     The Plaintiffs also incurred costs for daily subsistence during their travel to Arkansas.

40.     But for the Plaintiffs' employment with the Defendant, the Plaintiffs would not have incurred the expenses delineated in paragraphs 38 and 39.

41.     The expenses incurred by the Plaintiffs and delineated in paragraphs 38 and 39 were necessary to the Plaintiffs' employment with the Defendant.

42.     The expenses incurred by the Plaintiffs and delineated in paragraphs 38 and 39 primarily benefited the Defendant.

43.     The Defendant did not reimburse the Plaintiffs for the expenses delineated in paragraphs 38 and 39.

44.     The expenses described in paragraphs 38 and 39 functioned as de facto deductions from the Plaintiffs' wages during their first workweeks with the Defendant in 2006, 2007, and 2008.

45.     The deductions described in paragraphs 38 and 39 caused the Plaintiffs to earn less than the federally mandated minimum wage during their first workweeks with the Defendant in 2006, 2007, and 2008.

46.     In 2006, 2007, and 2008, the Defendant failed to provide the Plaintiffs with copies of their work contracts.

47.     In 2006, 2007, and 2008, the Defendant's contracts with the Plaintiffs included, among other terms:

a.   The terms listed in the clearance orders filed with the U.S. Department of Labor by the Defendant;

b.   The terms laid out in the U.S. Department of Labor's regulations governing the issuance of the Plaintiffs' H-2A visas;

c.   The length of the Plaintiffs' contracts as stated on each Plaintiff's work visa for each year worked; and

d.   The assurances set forth in 20 C.F.R. § 655.103.[1]

48.     On information and belief, in his 2006, 2007, and 2008 contracts with the Plaintiffs, the Defendant specifically offered the Plaintiffs terms of work that included:

a.   Free, clean housing meeting the applicable housing standards;

b.   Free, employer-provided transportation for grocery purchases;

c.   Employment for at least 3/4 of the workdays from the first date the Plaintiffs arrived at the place of employment until the contract's end date;

d.   Payment biweekly, on every other Saturday;

e.   Adequate earnings statements each payroll period;

f.   Hourly pay equal to the higher of the minimum wage, the adverse effect wage rate, or the prevailing wage rate;

---

[1] The numbering for the regulations governing the H-2A program is currently in flux. Plaintiffs herein cite to the Code of Federal Regulations as it was in effect during the time period relevant to this case.

g.  Reimbursement for the cost of transportation and subsistence from the place of recruitment to the place of employment upon the Plaintiffs' completion of 50% of the work contract period;

h.  Reimbursement for the cost of return transportation and subsistence from the place of employment to the place of recruitment upon the Plaintiffs' completion of the work contract;

i.  Employer-provided housing-to-worksite transportation complying with applicable laws and regulations;

j.  An assurance that the Defendant would maintain adequate records; and

k.  An assurance that the Defendant would not retaliate, threaten, coerce, blacklist, discharge, or in any manner discriminate against anyone who has with just cause consulted with an attorney an employee of a legal services program about rights or protections under the H-2A program or exercised or asserted rights or protections under the H-2A program.

49.    On information and belief, the Defendant's contracts with the Plaintiffs also provided that the Plaintiffs would only be terminated for (a) refusal without justified cause to perform work; (b) serious misconduct; or (c) failure to meet production standards after completing a training or break-in period.

50.    The housing provided to the Plaintiffs by the Defendant is governed by federal housing standards found at 29 C.F.R. § 1910.142 (the Occupational Safety and Health Administration migrant labor camp standards) and/or at 20 C.F.R. §§ 654.404-17 (the Employment and Training Administration housing standards).

51.    Upon arrival in Arkansas, the Plaintiffs and their coworkers were made to live in a concrete-and-metal packing shed full of sweet potatoes – a space in which the Plaintiffs also worked.

52.    The housing provided to the Plaintiffs by the Defendant failed to meet applicable housing and health and safety standards for many reasons, including, but not limited to, the presence of the following conditions:

a.  The shed was infested with snakes, flies and other insects, rats, and a foul-smelling species of worm attracted by the sweet potatoes. The Defendant failed to take reasonable measures to prevent or treat these infestations.

     b.  The shed harbored dangerous substances and conditions.

     c.  Some of the bedrooms in the shed had only one door.

     d.  The Defendant failed to provide the workers with first aid or fire extinguishing equipment.

     e.  The shed was filthy and the Defendant failed to take reasonable steps to clean any part of the shed during the time the Plaintiffs occupied it. The shed's main area was filled with machinery and sweet potatoes. The bathroom and showers were in particularly bad condition, and the entrance to one of the bathrooms was almost completely blocked by boxes of sweet potatoes. Because the drains did not function properly in either the bathrooms or shower, cardboard and plywood planks were put down on the floor to soak up liquids. The kitchen was dirty and poorly maintained.

     f.  The temperature and ventilation in the shed made the Plaintiffs' housing unbearable. The shed was unheated and grew extremely cold in the fall and winter, when the temperature lows were regularly in the thirties and forties. The shed was also unventilated and became extremely hot in the summer and early fall. Only one of the bedrooms had windows to the outside; the other two bedrooms had no exterior windows. The shed's bathroom had no windows and no ventilation. Because the workers were not allowed to be seen outside the shed unless they were working or escorted, they were forced to spend all their time inside in the sweltering heat when they were not laboring in the fields.

     g.  The shed lacked the basic housing comforts required by applicable regulations. The Defendant provided no proper beds for the Plaintiffs—only filthy mattresses, which sat directly on the bare floors and were crowded close to one another. The Defendant failed to provide separate arrangements for hanging clothing and storing personal effects. The Defendant did not provide the Plaintiffs with any toilet tissue. The Defendant provided more than 20 workers with just one stove, whose top needed to be propped up with metal and plywood when it began to sag from heavy use. Because one stove was inadequate for such a large group, the workers had to purchase a small propane camping stove. The workers divided themselves into groups and rotated among the stoves, sometimes waiting until late at night for a turn to cook supper.

53.     The Plaintiffs were constantly physically uncomfortable while living in these conditions.  At least one Plaintiff Plaintiffs developed a rash from the substandard conditions in the housing.  The overpowering forklift fumes caused gave several Plaintiffs sore throats, coughs, and eye irritation.

54.     The Plaintiffs' housing conditions made several Plaintiffs feel as if they were being imprisoned or penned up like animals.

55.     Attempting to tolerate the housing, the workers themselves, including the Plaintiffs, set up a cleaning schedule and spent time each week cleaning the kitchen, bathroom, and common areas. The Plaintiffs were not paid for this cleaning work.  The workers also did electrical work on the housing for which they were not paid.

56.     The Defendant charged the Plaintiffs fees in exchange for transporting them to shop for food and other necessities.

57.     The Defendant did not pay the Plaintiffs biweekly as promised.

58.     The Plaintiffs were not provided with proper earnings statements.

59.     In 2006, 2007, and 2008, the Plaintiffs were paid hourly rates below the applicable adverse effect wage rates for Arkansas.

60.     The Plaintiffs were not paid for all of their compensable travel time.

61.     The Defendant failed to reimburse the Plaintiffs for the cost of transportation and subsistence from Arkansas back to the places in Mexico where they were recruited.

62.     Each day, the Defendant transported the Plaintiffs to the fields in the back of an overcrowded van with no seats.  At times, 20 to 25 workers were crowded into the van, together with sharp tools and machinery.

63.     On information and belief, the Defendant failed to maintain adequate records as required by 20 C.F.R. § 655.102(b)(7).

64.     By their actions and omissions as described above, the Defendant breached their contracts with the Plaintiffs by, inter alia:

    a.  Failing to provide free, clean housing meeting the applicable federal housing standards;

    b.  Failing to provide free transportation for purchases of groceries and other necessities;

c.  Failing to pay the Plaintiffs biweekly;

d.  Failing to provide the Plaintiffs with earnings statements;

e.  Failing to pay the Plaintiffs at least the adverse effect wage rate for all hours worked;

f.  Failing to reimburse the Plaintiffs for the cost of transportation and subsistence from the place of their recruitment to the place of employment, despite the Plaintiffs' completion of 50% of the work contract period;

g.  Failing to reimburse the Plaintiffs for the cost of return transportation and subsistence from the place of employment to the place of recruitment, despite the Plaintiffs' completion of the work contract;

h.  Failing to provide housing-to-worksite transportation complying with applicable laws and regulations; and

i.  Failing to maintain adequate records.

65.    In 2008, Plaintiff Jose Guadalupe Cuarenta-Ramos consulted with an employee of Southern Migrant Legal Services/Texas RioGrande Legal Aid about his rights and protections under the H-2A program.

66.    The Defendant unlawfully discharged Plaintiff Jose Guadalupe Cuarenta-Ramos in retaliation for having engaged in such consultation.

67.    During the 2008 season, Plaintiff Jose Guadalupe Cuarenta-Ramos made an informal complaint to the Defendant regarding his rights under the FLSA.

68.    The Defendant unlawfully discharged Plaintiff Jose Guadalupe Cuarenta-Ramos because he engaged in activity protected by the FLSA.

69.    In addition to breaching the terms listed in paragraph 64, the Defendant breached his 2008 contract with Jose Guadalupe Cuarenta-Ramos by:

a.  Unlawfully firing him in retaliation for engaging in activity protected under the Immigration and Nationality Act; and

b.  Failing to offer him employment for at least 3/4 of the workdays from the first date he arrived at the Defendant's farm in 2008 until the contract's end date.

70.    In 2006, 2007, and 2008, the Plaintiffs fully performed their obligations under their contracts with the Defendant.

71.     The Defendant's agent, Angel Rico, coerced the Plaintiffs to pay him "recruitment fees."

72.     The Defendant knew or should have known that Angel Rico charged the workers these fees.

73.     These fees operated as de facto deductions from the Plaintiffs' wages during several of their workweeks with the Defendant, causing the Plaintiffs to earn less than the federally mandated minimum wage during several of their workweeks.

**FIRST CAUSE OF ACTION**
**TRAFFICKING VICTIMS PROTECTION ACT – TRAFFICKING**
**18 U.S.C. § 1590**

74.     The Plaintiffs reincorporate and re-allege paragraphs 1 through 71 of this Complaint as if fully set forth herein.

75.     Under 18 U.S.C. § 1590, "recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing]. . . any person for labor or services" in violation of 18 U.S.C. §§ 1581-94 is unlawful.

76.     18 U.S.C. § 1592 prohibits "knowingly destroy[ing], conceal[ing], remov[ing], confiscate[ing], or possess[ing]" any passport in the course of violating or attempting to violate TVPA provisions including 18 U.S.C. § 1589 and 18 U.S.C. § 1590.

77.     By knowingly confiscating and possessing the Plaintiffs' passports in 2006, 2007, and 2008, the Defendant violated 18 U.S.C. § 1592 in the course of violating or attempting to violate 18 U.S.C. §§ 1589 and 1590.

78.     The Defendant's violation of 18 U.S.C. § 1592 constituted a violation of 18 U.S.C. § 1590.

79.     The Plaintiffs suffered harm as a result of the Defendant's violation of 18 U.S.C. § 1590.

80.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs seek to recover the damages they suffered as a result of the Defendant's violation.

**SECOND CAUSE OF ACTION**
**TRAFFICKING VICTIMS PROTECTION ACT – FORCED LABOR**
**18 U.S.C § 1589**

81.    The Plaintiffs reincorporate and re-allege paragraphs 1 through 71 of this Complaint as if fully set forth herein.

82.    Under 18 U.S.C. § 1589, it is unlawful to "knowingly provid[e] or obtain[n] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

83.    In threatening to stamp workers' passports so that they would never be able to return to the U.S. legally, the Defendant knowingly obtained the labor and services of the Plaintiffs by threatening them with serious harm, in violation of 18 U.S.C. § 1589(2).

84.    In telling the Plaintiffs that he and/or Angel Rico had the power to stamp workers' passports so that they would never be able to return to the U.S. legally, in forcing the workers to go on shopping trips without the documents they were required by law to carry, and in holding the workers' passports so that they could not travel without fear of deportation, the Defendant knowingly obtained the labor and services of the Plaintiffs by threatening them with the abuse of law or legal process, in violation of 18 U.S.C. § 1589(3).

85.    By subjecting the Plaintiffs to physical and linguistic isolation and verbal intimidation, by confiscating the Plaintiffs' passports, and by falsely stating that he had the power to forever bar the Plaintiffs from legally returning to the U.S., the Defendant knowingly obtained the labor and services of the Plaintiffs through a scheme, plan, or pattern that was intended to cause and did cause the Plaintiffs to believe that they would suffer serious harm if they did not perform such labor or services, in violation of 18 U.S.C. § 1589(4).

86.    The Plaintiffs suffered harm as a result of the Defendant's violation of 18 U.S.C. § 1589.

87.    Pursuant to 18 U.S.C. § 1595, the Plaintiffs seek to recover the damages they suffered as a result of the Defendant's violation.

## THIRD CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – MINIMUM WAGE
## 29 U.S.C. § 206(a)

88.     The Plaintiffs reincorporate and re-allege paragraphs 1 through 71 of this Complaint as if fully set forth herein.

89.     The Defendant failed to pay the Plaintiffs at least the federally mandated minimum wage for each compensable hour they worked in a workweek, in violation of 29 U.S.C. § 206(a).

90.     The Defendant's violation of the minimum wage provision of the FLSA was willful within the meaning of 29 U.S.C. § 255(a).

91.     The Plaintiffs suffered damages as a result of the Defendant's violation of 29 U.S.C. § 206(a).

92.     For these violations, the Plaintiffs are entitled to their unpaid minimum wages, an equal amount in liquidated damages, and costs of court, pursuant to 29 U.S.C. § 216(b). The Plaintiffs further seek a declaratory judgment stating that the Defendant violated the Plaintiffs' rights under the FLSA.

## FOURTH CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – RETALIATION
## 29 U.S.C. § 215(a)(3)
### BY PLAINTIFF JOSE GUADALUPE CUARENTA-RAMOS

93.     Plaintiffs reincorporate and re-allege paragraphs 1 through 71 of this Complaint as if fully set forth herein.

94.     The Defendant intentionally retaliated against Plaintiff Jose Guadalupe Cuarenta-Ramos because he engaged in activity protected by the FLSA, in violation of 29 U.S.C. § 215(a)(3).

95.     Plaintiff Jose Guadalupe Cuarenta-Ramos suffered harm as a result of the Defendant's unlawful retaliation.

96.     For this violation, Plaintiff Jose Guadalupe Cuarenta-Ramos is entitled to his lost wages, an equal amount in liquidated damages, and costs of court, pursuant to 29 U.S.C. § 216(b). Plaintiff Jose Guadalupe Cuarenta-Ramos further seeks a declaratory judgment stating that the Defendant violated his rights under the FLSA.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT

97.     The Plaintiffs reincorporate and re-allege paragraphs 1 through 71 of this Complaint as if fully set forth herein.

98.     The Defendant entered into employment contracts with the Plaintiffs in 2006, 2007, and 2008.

99.     The Plaintiffs accepted the terms and conditions offered by the Defendant in such contracts.

100.    The Defendant breached such employment contracts with the Plaintiffs by failing to comply with the promised terms and conditions of employment.

101.    The Plaintiffs were at all times ready, willing, and able to comply with the terms of the employment contracts and did in fact comply with the terms.

102.    As a direct consequence of the Defendant's breach of the employment contracts, the Plaintiffs suffered harm.

103.    The Plaintiffs seek damages for the harm they have suffered as a result of the Defendant's breach of contract.

## PRAYER FOR RELIEF

104.    WHEREFORE, the Plaintiffs respectfully request that the Court grant them the following relief:

a.  Declare that the Defendant, by his acts and omissions described above, violated the Plaintiffs' rights under the minimum wage provisions of the FLSA at 29 U.S.C. § 206(a);

b.  Declare that the Defendant, by his acts and omissions described above, violated Plaintiff Jose Guadalupe Cuarenta-Ramos's rights under 29 U.S.C. § 215(a)(3);

c.  Declare that the Defendant, by his acts and omissions described above, violated 18 U.S.C. §§ 1589 and 1590;

d.  Declare that the Defendant, by his acts and omissions described above, breached the various contracts entered into with Plaintiffs;

     e.   Award further declaratory relief;

     f.   Award compensatory and punitive damages;

     g.   Award liquidated damages as authorized by the FLSA;

     h.   Award Plaintiffs pre- and post- judgment interest as allowed by law and costs of court; and

     i.   Grant further relief as this Court deems just and equitable.

Respectfully submitted,


Sarah E. Donaldson
Tex. Bar No. 24065158
Motion to Appear Pro Hac Vice Filed
TEXAS RIOGRANDE LEGAL AID, INC.
300 South Texas Blvd.
Weslaco, Texas 78596
Tel.:   (956) 447-4800
Fax:   (956) 968-8823
sdonaldson@trla.org


Melody Fowler-Green   SWP by Sh E. L
Melody Fowler-Green
Tenn. Bar No. 023266
Motion to Appear Pro Hac Vice Forthcoming
SOUTHERN MIGRANT LEGAL SERVICES
A PROJECT OF TEXAS RIOGRANDE LEGAL AID, INC.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Tel.: (615) 750-1200
Fax: (615) 366-3349
mfgreen@trla.org


Douglas L. Stevick   SWP by Sh E. L
Douglas L. Stevick
Tenn. Bar No. 021711
Member of the Bar of the Eastern District of Arkansas
SOUTHERN MIGRANT LEGAL SERVICES
A PROJECT OF TEXAS RIOGRANDE LEGAL AID, INC.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Tel.: (615) 750-1200
Fax: (615) 366-3349
dstevick@trla.org